UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 3:10-CR-120 JD |
| v. | ) | Case No. 3:10-CR-126(2) JD |
| | ) | Case No. 3:14-CV-1733 JD |
| JEREMIE SHENEMAN | ) | |

**<u>OPINION AND ORDER</u>**

Now before the Court is the Defendant Jeremie Sheneman's motion under 28 U.S.C.

§ 2255 to vacate his convictions for wire fraud. Mr. Sheneman was charged under two

indictments with a total of seven counts of wire fraud relating to two separate fraudulent schemes

in the mortgage industry. He was convicted on all counts in two jury trials, and was sentenced to

concurrent terms of 120 months' imprisonment on each count. The Seventh Circuit affirmed Mr.

Sheneman's convictions on appeal, and the Supreme Court denied Mr. Sheneman's petition for a

writ of certiorari. Having received no relief on direct appeal, Mr. Sheneman now seeks collateral

relief through this § 2255 proceeding. For the reasons that follow, the Court finds that Mr.

Sheneman is not entitled to any relief under § 2255, and denies Mr. Sheneman's motion.

## I. FACTUAL BACKGROUND

Mr. Sheneman was charged under two indictments for his participation in two separate

wire fraud schemes. These cases were tried in separate jury trials and resulted in Mr. Sheneman's

conviction on all seven counts. The Court briefly summarizes the facts of the respective cases.

### A. Case 3:10-CR-120

In the -120 case, Mr. Sheneman was the sole defendant, and was charged with three

counts of wire fraud in connection with his role in acquiring eight properties on behalf of his

grandmother, Phyllis Sheneman,[1] in violation of 18 U.S.C. § 1343 and § 2. Mr. Sheneman had worked for several years as a mortgage broker, so in 2005, when Phyllis decided she wanted to purchase rental properties as a means of investing, she turned to Mr. Sheneman for help. With the assistance of real estate agents whom Mr. Sheneman retained, Mr. Sheneman identified eight properties for Phyllis to purchase—three in Chicago, one in California, and four in New York. Phyllis did not take part in that process. Once the properties were under contract, Mr. Sheneman located mortgage brokers to secure mortgages on all the properties, all of which would be in Phyllis' name only. Two of those brokers testified at trial: Alex Veksler, who was a loan officer in New York at the time, and Andrew Weiske, who was a loan originator in California.

Mr. Veksler and Mr. Weiske both testified that Mr. Sheneman was their primary contact relative to these properties, and that they had few if any contacts with Phyllis. Phyllis may have provided her biographical information for the loan applications, but they testified that Mr. Sheneman provided the rest of the information, including Phyllis' financial information. However, the government asserted that much of the information provided by Mr. Sheneman was fraudulent. For example, while Phyllis' tax return showed that she made about $15,000 the previous year, and a loan application she had completed personally listed her monthly income as $2,500, the applications for the properties with which Mr. Sheneman was involved listed her monthly income as from $10,000 to over $16,000. Several of the applications also stated that the property was intended as a primary or secondary residence, even though Phyllis actually intended to buy them as investment properties. Further, the eight properties closed over a period of almost three months, but as the properties closed, they were not disclosed in subsequent

---

[1] Since this case involves several of Jeremie Sheneman's family members who share the same last name, the Court refers to Jeremie Sheneman as Mr. Sheneman, and refers to Michael Sheneman, his father, and Phyllis Sheneman, his grandmother, by their first names.

applications. The only exception was that one of the last properties to close listed two, but not all, of the other properties Phyllis had already purchased.

In addition, throughout the application process, the lenders requested various letters of explanation as conditions to approving the loan. Many of these related to Phyllis' employment, as she had been self-employed as a part owner of a consignment shop, which in truth generated quite little income. However, the letters submitted to the lenders in response to these requests contained complete falsehoods. One such letter, purporting to be signed by Phyllis' accountant, states that "Phyllis has demonstrated herself as a top clothing designer and entrepreneur," (Exhibit 10C), while another, which purports to be signed by Phyllis, states that the "reason for the move to New York is to expand the clothes business and to create a center main office," which would "bring in more profit and clothes [and] also serve to expand [her] business goals." (Exhibit 10E). Another letter purporting to be signed by Phyllis states, "I Phyllis Sheneman will be going back and forth from Indiana to California and I have a Manager in place at my store to continue to run the business." (Exhibit 4E). Yet another letter bearing Phyllis' signature described her "employment [in] the fast paced ever-changing business of clothing manufacturing & design." (Exhibit 7E). The undisputed evidence showed that each of these statements was patently false—not only had Phyllis never been in the clothing design business, but she no longer owned or earned income from the consignment shop at the time of the applications. Phyllis denied having written these letters, and Mr. Veksler and Mr. Weiske testified that all such letters were sent to them by Mr. Sheneman.

Mr. Sheneman testified in his own defense, and generally denied having been responsible for or even aware of any of these misrepresentations. He testified that his only role in the loan application process was to forward the brokers Phyllis' bank statements, and that the lenders then

calculated her income based on the statements and inserted those calculations into the loan applications. Any falsehoods must have come from the brokers or the lenders themselves, according to Jeremie. However, Mr. Sheneman admitted to having falsified a lease agreement that falsely showed that Phyllis was receiving rental income from her primary residence, which she was not actually renting to anyone. Mr. Sheneman testified that Mr. Weiske had only requested that documentation after the property had closed, so it could not have been material to the lender's approval of the loan. Yet, he was unable to account for why several of the loan applications stated that Phyllis' home was generating that same rental income. (Exhibits 7B, 8B, 10B).

The three counts of the indictment were each predicated on a separate wire transmission relating to the last two properties to close, including two interstate faxes sent prior to the closings and the interstate wiring of money from the lender to the closing agent. Ultimately, the jury returned a verdict of guilty on all three counts.

**B.      Case 3:10-CR-126**

In the -126 case, Mr. Sheneman was charged and tried along with his father in connection with a separate scheme to defraud that took place around the same time. The facts of the -126 case, as set forth by the court of appeals on Michael's direct appeal, are as follows:

> From 2003 to 2005, [Michael] Sheneman and Jeremie worked in tandem to defraud both real estate buyers and mortgage lenders through a series of calculated misrepresentations. Generally speaking, their plan involved acquiring control over a large number of rental properties, inducing buyers to purchase the properties through a host of false promises, and ensuring that lenders would finance the purchases by falsifying loan documents and misrepresenting the buyers' financial standing.
>
> Sheneman and Jeremie began by acquiring control over a large number of rental properties being sold by landlords in the South Bend and Mishawaka areas of Indiana. Many of these sellers had difficulty renting out their properties—some were in very poor condition—and were, by and large, simply looking to cut their losses and walk away from the homes with their mortgages and taxes paid. They

4

agreed to sell their properties to either Sheneman or Jeremie, both of whom had a reputation for "flipping" homes and selling them at a profit. Although most sellers believed they had sold their properties directly to either Sheneman or Jeremie, the sellers had in fact merely granted one of the two power of attorney over their properties.[2] By exercising powers of attorney, Sheneman and Jeremie took control over the properties without ever appearing on any chain of title. The sellers, for their part, did not notice much of a practical difference. Each seller received the amount of money agreed upon as the selling price—albeit not from a title company, as would normally be the case, but directly from either Sheneman or Jeremie. After they "flipped" the houses and sold them to new buyers for more than the seller's asking price, Sheneman and Jeremie then endorsed and deposited the checks issued by the title company directly into their own accounts, yielding them hefty profits.

Once granted control, Sheneman and Jeremie then set about searching for buyers to purchase the dilapidated properties. Eventually, they found their marks, selling sixty properties to four buyers with no relevant real estate experience: Gladys Zoleko, a Cameroonian citizen in the United States on a student visa, bought fifteen homes; Paul Davies, a Liberian citizen also on a student visa, bought fourteen homes; David Doo[]little, an electrician, bought twenty-one homes; and Gary Denaway, a maintenance worker, bought ten homes. For each buyer, a very similar pattern of conduct transpired.

Sheneman and Jeremie made a wide range of promises to the buyers—false promises, as it turns out—in order to induce the sales. The buyers were all looking for an additional source of income, and Sheneman promised them just that. Significant profits could be made by purchasing homes and then renting them out—the more homes purchased, the bigger the profit. The homes were all in excellent condition, buyers were assured, and either Sheneman or Jeremie would make any necessary repairs. There was also little risk because most of the homes already had paying tenants living in them, and Sheneman and Jeremie would help find new tenants for vacant homes. And if the buyers ever wanted to get out of the real estate business, Sheneman and Jeremie promised to buy back properties that they no longer wanted. Perhaps most enticing of all, Sheneman and Jeremie also promised to cover all down payments and closing costs. The buyers, despite their relatively modest incomes, could therefore purchase a large number of homes and begin earning an immediate profit—without having to spend a dime out-of-pocket. They jumped at the chance.

The buyers, for their part, ignored some clear red flags. Most obviously, they were only permitted to see one or two of the properties they were purchasing prior to closing. The other homes, buyers were told, had tenants already living in them and a visit to those homes might disturb the tenants. But the buyers were assured

---

[2] Of the sixty homes, Sheneman purchased or was granted power of attorney over thirty-four homes. [All footnotes in original.]

that the other homes were all in similar condition and located in comparable neighborhoods.

Buyers filled out only minimal paperwork throughout the process. Sheneman brought each potential buyer to Superior Mortgage, a mortgage broker where Jeremie worked as a loan officer.[3] There, each buyer completed a few documents with some very basic information. Shortly thereafter, Jeremie informed the buyer that he or she was approved to buy a large number of properties. In order to ensure that mortgage lenders approved the loan applications, however, Jeremie falsified key parts of the documents. Among other misrepresentations, numerous loan applications falsely stated the buyers' citizenship, employment status, and finances, and the buyers' signature on many documents was often forged.

Beyond falsifying documents, Sheneman and Jeremie took other steps to secure financing from lenders and ensure the closings took place. First, they artificially inflated buyers' bank accounts, depositing tens of thousands of dollars in order to make it appear as though the buyers had sufficient assets to take on the loans. After the transactions were completed, the money was returned to Sheneman and Jeremie. Second, they masked the buyers' financial infirmities from lenders by utilizing certified checks to cover down payments and closing costs. Lenders therefore had no way of knowing that the buyers were not the true source behind these payments, as the loan documents contemplated.

After closing, each of the buyers quickly discovered that the deals they were promised were too good to be true. A number of the newly purchased homes were hardly habitable. Some had faulty plumbing, others had significant mold and termite damage, and yet others had structural damage and leaky roofs. Moreover, paying tenants were difficult to come by. Many of the homes did not have tenants living in them—despite previous assurances to the contrary—while others had tenants who never paid rent. Often, the few homes that the buyers had actually viewed prior to closing were not even included among the properties they had purchased. Many of the properties were also located in worse neighborhoods than the ones they had visited.

When the buyers contacted Sheneman and Jeremie to repair the homes or assist them in finding tenants, as they had promised to do, they were suddenly difficult to reach. The buyers' calls would often be ignored, or Sheneman and Jeremie would hang up when the buyers began complaining. In the end, Sheneman and

---

[3] Although only Jeremie was an employee of Superior Mortgage, Sheneman attended many of the buyers' meetings with Jeremie, and visited the offices often enough that some employees mistakenly believed Sheneman was a part owner of the business. [Technically, Jeremie Sheneman was not actually an employee of Superior Mortgage, as he received no salary or commission, and his name did not appear as the loan officer on any of the loans that he originated. Rather, he originated loans through Superior Mortgage with the consent of its owner, Andrew Beam, and he listed Mr. Beam as the loan officer on each of the loan applications, which concealed his obvious conflict of interest from the lenders.]

Jeremie made very few repairs to the properties and reneged on their promise to buy any of them back. Unsurprisingly, each of the buyers was soon unable to make timely mortgage payments. Of the sixty properties: thirty-six were foreclosed upon, eleven were deeded back to the lender in lieu of foreclosure, six were demolished by the city, and four were sold in tax sales.[4]

Sheneman and Jeremie were indicted on October 13, 2010, and charged with four counts[5] of wire fraud in violation of 18 U.S.C. § 1343. After a four-day jury trial, they were convicted on all four counts.

*United States v. Sheneman*, 682 F.3d 623, 626–28 (7th Cir. 2012).[6]

## C.    Procedural History

Following each trial, Mr. Sheneman's appointed counsel, Mr. Robert Truitt, filed Rule 33 motions through which Mr. Sheneman asserted claims of ineffective assistance of counsel. Accordingly, the Court appointed substitute counsel, Mr. Clark Holesinger, to represent Mr. Sheneman going forward. The Court held an evidentiary hearing as to the Rule 33 motion in the -120 case, at which Mr. Sheneman and Mr. Truitt testified, while Mr. Sheneman opted to forego a hearing in the -126 case. On May 18, 2012, the Court denied both motions in extensive orders. The Court then held a consolidated sentencing hearing addressing both cases, and after resolving a number of objections, the Court sentenced Mr. Sheneman to concurrent terms of 120 months of imprisonment on each of the seven counts. Mr. Sheneman appealed to the Seventh Circuit Court of Appeals, which affirmed his convictions. The Supreme Court subsequently denied Mr. Sheneman's petition for a writ of certiorari, at which point his convictions became final. Mr.

---

[4] A forensic auditor for the Department of Housing and Urban Development, Richard Urbanowski, was unable to determine the status of the final three properties.

[5] Each count charged in the indictment identified one property sold in connection with the wire fraud. Thus, a total of four properties were identified in the indictment. At trial, the government presented evidence that sixty properties were sold as part of the overall mortgage fraud scheme.

[6] For a detailed summary of the testimony of each witness, see Case 126, DE 150 (*United States v. Sheneman*, 2012 WL 1831551 (N.D. Ind. May 18, 2012)).

Sheneman then timely filed the present motion under § 2255, asking that the Court vacate each of his convictions.[7]

## II. STANDARD OF REVIEW

Section 2255(a) of Title 28 provides that a federal prisoner may claim "the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, [and] may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). The Seventh Circuit has recognized that § 2255 relief is appropriate only for "an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Harris v. United States,* 366 F.3d 593, 594 (7th Cir. 2004) (citation omitted). Further, "a Section 2255 motion is neither a recapitulation of nor a substitute for a direct appeal." *Olmstead v. United States*, 55 F.3d 316, 319 (7th Cir. 1995) (citation omitted). Relief under § 2255 is extraordinary because it seeks to reopen the criminal process to a person who has already had an opportunity of full process. *Almonacid v. United States,* 476 F.3d 518, 521 (7th Cir. 2007) (citing *Kafo v. United States,* 467 F.3d 1063, 1068 (7th Cir. 2006)). Consequently, "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." Rule 4, Rules Governing Section 2255

---

[7] The Court acknowledges that under Rule 2(d) of the Rules Governing Section 2255 Proceedings for the United States District Courts, "A moving party who seeks relief from more than one judgment must file a separate motion covering each judgment." Here, Mr. Sheneman was prosecuted in two separate trials under two separate cause numbers, but the matters were handled jointly for sentencing, and each of the convictions and sentences were included in the same judgment, which was then entered in both cause numbers. Since the same judgment applied to both cause numbers, the Court interprets this rule as permitting Mr. Sheneman to challenge his convictions in both cause numbers through the same § 2255 motion. The Court expressly directed Mr. Sheneman to do so, which he did, and neither party has challenged this procedure.

Proceedings for the United States District Courts. A court may also deny a § 2255 motion without an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *Humphrey v. United States*, 896 F.2d 1066, 1070 (7th Cir. 1990).

### III. DISCUSSION

Mr. Sheneman's motion presents numerous arguments in support of his claim for relief under § 2255. The Court agrees with the government that these arguments are most sensibly organized into substantive claims, claims of government misconduct, and claims of ineffective assistance of counsel, so the Court addresses them in that order. The Court also notes that since he filed his initial motion, Mr. Sheneman has filed numerous supplements, amendments, and motions relating to his § 2255 motion. Since these additional filings mostly just rehash the arguments in Mr. Sheneman's initial filing, the Court does not address them individually. To the extent these filings raise new claims or arguments that warrant discussion, the Court has addressed them below. Mr. Sheneman also makes a number of procedural requests relating to his § 2255 motion, which the Court addresses last.

### A.     Substantive Claims

Mr. Sheneman asserts a number of substantive arguments against his convictions, including that the Court lacked subject matter jurisdiction, that the Court lacked personal jurisdiction and venue was improper, that the Court improperly instructed the jury, and that the indictments were constructively amended. The Court addresses each in turn, and finds that none of these claims warrants any relief.

### 1.     Subject Matter Jurisdiction

The argument that Mr. Sheneman pursues most insistently in his filings is that this Court did not have subject matter jurisdiction over this matter, but that argument is frivolous. This

Court had subject matter jurisdiction based on 18 U.S.C. § 3231, which states, "The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States." The charges against Mr. Sheneman alleged that he violated 18 U.S.C. § 1343 and 18 U.S.C. § 2. Those are laws of the United States, so this Court had subject matter jurisdiction under 18 U.S.C. § 3231 to adjudicate whether Mr. Sheneman committed offenses against those laws. *United States v. Burke*, 425 F.3d 400, 408 (7th Cir. 2005) ("Subject-matter jurisdiction is furnished by 18 U.S.C. § 3231, which covers all criminal prosecutions under the United States Code."). That is the beginning and end of the subject matter jurisdiction analysis.

Mr. Sheneman's arguments on this point confuse subject matter jurisdiction over a charge with what the government would have to prove in order to secure a conviction on that charge. He argues that he did not use wire transmissions and that he did not obtain any property through the scheme, which he contends deprives this Court of subject matter jurisdiction. Even if he were correct that the government failed to meet its burden of proof on those issues, though, that would only mean that the Court should have adjudicated him not guilty of the charges, not that the Court never had jurisdiction to adjudicate his guilt in the first place. In other words, what provides this Court with subject matter jurisdiction over these cases is the fact that Mr. Sheneman was *charged* with violating federal laws, not that he was actually guilty of those charges. *See generally United States v. Kincaid*, 571 F.3d 648, 653 (7th Cir. 2009) ("A 'jurisdictional element' is simply an element of a federal crime. It is jurisdictional only in the shorthand sense that without that interstate commerce nexus, there can be no federal crime. It is not jurisdictional in the sense that it affects a court's subject matter jurisdiction, i.e., a court's constitutional or statutory power to adjudicate a case, here authorized by 18 U.S.C. § 3231."

(internal citations and alterations omitted)). In any event, Mr. Sheneman's arguments that the government failed to meet its burden of proof are baseless. Those arguments were resolved against him on appeal as to the -126 case, and were rejected by this Court in multiple post-trial orders in both cases, so this argument would fail on that basis as well.

Further, Mr. Sheneman's arguments that the Court "lost" jurisdiction by giving erroneous jury instructions are meritless. Even if the Court had erred in that or any other respect, that would not have implicated the Court's subject matter jurisdiction over these charges: "'once subject-matter jurisdiction has properly attached, courts may exceed their authority or otherwise err without loss of jurisdiction.'" *United States v. Ceballos*, 302 F.3d 679, 691 (7th Cir. 2002) (quoting *Prou v. United States*, 199 F.3d 37, 45 (1st Cir. 1999)); *United States v. Wey*, 895 F.2d 429, 431 (7th Cir. 1990) ("Courts may err, even offend against the Constitution, without losing subject-matter jurisdiction."). Therefore, the Court finds that it properly had subject matter jurisdiction over these charges, and rejects these arguments as bases for granting relief under § 2255.

## 2. Personal Jurisdiction and Venue

Mr. Sheneman also questions this Court's personal jurisdiction over him, but that argument is frivolous as well. "Personal jurisdiction is supplied by the fact that [the defendant] is within the territory of the United States." *Burke*, 425 F.3d at 408; *United States v. Phillips*, 326 F. App'x 400 (7th Cir. 2009) ("[A] district court has personal jurisdiction over any defendant brought before it on a federal indictment charging a violation of federal law."). Mr. Sheneman was in the United States and appeared before this Court on these federal charges, so this Court had personal jurisdiction over him. In any event, Mr. Sheneman is barred from raising this issue on collateral review, as personal jurisdiction can be waived at any time by a failure to assert the defense, and he failed to assert this defense prior to his conviction or on appeal. *United States v.*

*Chappell*, 956 F.2d 272 (table), No. 90-3673, 1992 WL 42326, at *3 (7th Cir. Mar. 4, 1992); *see also Prou*, 199 F.3d at 45 (holding that personal jurisdiction "is subject to the normal rules of waiver and procedural default").

The substance of Mr. Sheneman's arguments on this topic appears aimed more at challenging venue in the Northern District of Indiana, at least as to the -120 case, since all of the properties at issue in that case were located out of state. A challenge on that basis fares no better, though. Under 18 U.S.C. § 3237(a), "any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed." Accordingly, venue is only improper "if the only acts that occurred in that district do not provide evidence of the elements of the charged crime." *United States v. Ringer*, 300 F.3d 788, 792 (7th Cir. 2002). Here, the evidence showed that Mr. Sheneman conducted at least part of the schemes at issue in the Northern District of Indiana, as—by his own admissions—he sent and received faxes relative to the properties from his office at Superior Mortgage in Mishawaka, Indiana. Those faxes provide evidence of Mr. Sheneman's participation in the scheme to defraud, which is an element of the charged crimes, so a challenge to venue would have therefore failed on its merits. In addition, since Mr. Sheneman did not contest venue in the first instance at trial or in a motion for acquittal, any challenge to venue is waived and could not have even been raised on direct appeal, much less in a collateral proceeding. *Id.* at 790; *United States v. Brandon*, 50 F.3d 464 (7th Cir. 1995). Therefore, Mr. Sheneman's challenges to personal jurisdiction and venue warrant no relief under § 2255.

### 3. Jury Instructions

Mr. Sheneman also raises a number of alleged errors in the jury instructions, but these arguments fail for several reasons. First, Mr. Sheneman cannot assert any error in the jury

instructions because his counsel affirmatively waived any objection to the instructions at trial.

Waiver is the "deliberate relinquishment of a known right." *United States v. Richardson*, 238

F.3d 837, 841 (7th Cir. 2001). Courts will not "override the clearly expressed wish of a party or

his lawyer, which may be backed by excellent strategic reasons, not to invoke a particular right."

*Id.* Accordingly, an issue that is waived "is barred from receiving further judicial consideration,

unless the lawyer violated his duty of providing his client with effective assistance of counsel."

*Id.* (internal citations omitted); *United States v. Murry*, 395 F.3d 712, 717 (7th Cir. 2005).

Prior to each trial, the Court filed its proposed jury instructions for the parties'

consideration. [Case 120, DE 33; Case 126, DE 46]. Then, near the close of evidence in each

case, the Court held an instruction conference on the record, during which the Court addressed

each instruction individually, asking if any party had any objection. Mr. Sheneman's attorney

responded as to each instruction at issue that he had "No objection." [Case 120, DE 80 p. 194–

95; Case 126, DE 77, p. 229–38; DE 78 p. 102–04; *see also* DE 47]. This is a clear example of

waiver. The Seventh Circuit has "found waiver in a number of similar instances when the

defendant or his attorney expressly declined to press a right or make an objection." *Murry*, 395

F.3d at 717 (collecting cases). In fact, the Seventh Circuit addressed a nearly identical factual

scenario in *Murry*, holding:

> In this case, Murry waived his objection to the jury instruction at issue. The trial
> court asked Murry's counsel twice whether he had any objections to the
> instructions and twice he replied definitively that he did not. He was thus aware
> that he could lodge an objection and purposefully declined to do so.

*Id.* Here, after receiving ample time to review the instruction, the defendant expressly stated that

he had no objection. Accordingly, Mr. Sheneman has waived his right to contest the instructions

directly.

Even absent this express waiver, Mr. Sheneman would be barred from raising this issue on collateral review due to his procedural default. Having failed to challenge the jury instructions on direct appeal, Mr. Sheneman must demonstrate "cause and actual prejudice" in order to raise these arguments now, meaning he must show both "(1) 'cause' excusing his double procedural default, and (2) 'actual prejudice' resulting from the errors of which he complains." *United States v. Frady*, 456 U.S. 152, 167–68 (1982). But Mr. Sheneman has not made a showing of cause, nor, as discussed below, can he show any actual prejudice, so his challenge to the jury instructions fails on that basis as well.

Moreover, even putting waiver and default aside, the jury instructions were complete and correct statements of the law, so Mr. Sheneman's arguments fail even on their merits. Mr. Sheneman primarily takes issue with the following language: "The wire fraud statute can be violated whether or not there is any loss or damage to a victim of the crime or gain to a defendant." [Case 120, DE 61 p. 14; Case 126, DE 58 p. 19]. This language was taken directly from the Seventh Circuit Pattern Jury Instructions. Mr. Sheneman appears to argue that this is incorrect, and that he can only have committed wire fraud if a victim of the fraud actually paid money directly to him, but that is not accurate. "The wire fraud statutes criminalize the fraudulent acts undertaken to secure illicit gains, not their ultimate successes," *United States v. Lupton*, 620 F.3d 790, 805 (7th Cir. 2010), so Mr. Sheneman could have committed wire fraud even if the banks rejected every loan application and never released any funds. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 648 (2008) ("Using the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud . . . even if no one relied on any misrepresentation.").

Likewise, a defendant can have committed wire fraud even if the proceeds of the scheme only accrued to other parties. "A participant in a scheme to defraud is guilty even if he is an altruist and all the benefits of the fraud accrue to other participants, just as a conspirator doesn't have to benefit personally to be guilty of conspiracy . . . ." *United States v. Spano*, 421 F.3d 599, 603 (7th Cir. 2005); *see also United States v. Sorich*, 523 F.3d 702, 709–10, 713 (7th Cir. 2008) (holding that wire fraud can occur even if the benefits of the scheme go only to innocent third parties, and stating that there is no "requirement that the defendant receive the money or property" at issue). As the Seventh Circuit explained on Mr. Sheneman's direct appeal, "even if Sheneman's father had gotten everything and Sheneman nothing, the evidence would be sufficient because . . . Sheneman intentionally participated in a scheme to defraud using the wires to enrich at least one of the schemers—the essence of wire fraud." *Sheneman*, 538 F. App'x at 723. It was thus accurate for the Court to instruct the jury that the wire fraud statute could be violated even absent loss to a victim or gain to the defendant, so the Court rejects Mr. Sheneman's argument.

Mr. Sheneman also argues at various points that the jury instructions were improper relative to the requirement that the scheme to defraud caused interstate wire communications to take place. However, he does not indicate which instructions were improper, or how, and the Court sees no error in this respect. The instructions included as an element of every count "that for the purpose of carrying out the scheme or attempting to do so, the defendant caused interstate wire communications to take place in the manner charged in the particular count." A separate instruction then defined the contours of this element, such as that the wire communication need only have been foreseeable, that the defendant need not have personally used an interstate communication facility, and that the communication need not have contained fraudulent

representations itself. These instructions accurately set forth the law and required the jury to find

that Mr. Sheneman had caused interstate wire communications to take place for the purpose of

carrying out the scheme to defraud, so there is no error in this respect.

Last, Mr. Sheneman states that nothing in the jury instructions required the jury to find

that each of the essential elements of the offense had been proven. To the extent Mr. Sheneman

means to argue that the instructions misstated the elements of the offense, the Court has rejected

those arguments above. To the extent he means to argue that the jury was not instructed that the

government had to prove every element of the offense, Mr. Sheneman is mistaken. The

instructions as to every count concluded as follows:

> If you find from your consideration of all the evidence that each of these
> propositions has been proved beyond a reasonable doubt, then you should find the
> defendant guilty on [this count]. If, on the other hand, you find from your
> consideration of all the evidence that any one of these propositions has not been
> proved beyond a reasonable doubt, then you should find the defendant not guilty
> on [this count]."

[Case 120, DE 61 p. 10–12; Case 126, DE 58 p. 10–17 (including additional language to

distinguish between the two defendants)]. Therefore, the Court rejects each of Mr. Sheneman's

arguments that the jury instructions were faulty.

### 4. Constructive Amendment of the Indictment

Mr. Sheneman next argues that the indictments were constructively amended, violating

his rights to an indictment and to notice of the charges against him, as guaranteed by the Fifth

and Sixth Amendments. An indictment is constructively amended when a defendant is convicted

of an offense different from or in addition to those charged in the indictment. *United States v.

Ratliff-White*, 493 F.3d 812, 820 (7th Cir. 2007); *United States v. Trennell*, 290 F.3d 881, 888

(7th Cir. 2002). This occurs when "'either the government (usually during its presentation of

evidence and/or its argument), the court (usually through its instructions to the jury), or both,

broadens the possible bases for conviction beyond those presented by the grand jury.'" *United States v. Cusimano*, 148 F.3d 824, 829 (7th Cir. 1998) (quoting *United States v. Floresca*, 38 F.3d 706, 710 (7th Cir. 1994)).

Mr. Sheneman argues as to both cases that the Court constructively amended the indictment by giving incorrect or incomplete jury instructions that allowed the jury to convict him without having found all of the essential elements of the offenses. As discussed above, however, the jury instructions were not erroneous, so there was no constructive amendment in this respect. The only other argument Mr. Sheneman raises in support of a constructive amendment relates to the -126 case. He alleges that the introduction of evidence in that case that he had forged signatures necessarily constitutes a constructive amendment because forgery is a separate substantive crime for which he was not indicted. Mr. Sheneman's argument misses the mark, though, since while he was not indicted for forgery, neither was he convicted of forgery. Rather, he was only convicted of wire fraud, and the jury instructions required the jury to have found all of the essential elements of wire fraud—not forgery—in order to convict Mr. Sheneman on any count. The government introduced evidence of forgery, but that was merely evidence of the means by which Mr. Sheneman executed the wire fraud scheme for which he was indicted and convicted, as the Court discussed at more length as to Michael's § 2255 motion. [Case 126, DE 255 pp. 39–41]. Since an indictment need only notify the defendant of the charges against him, not the evidence by which the government will prove those charges, the indictment did not need to accuse Mr. Sheneman of forgery for the government to have offered evidence on that topic. Thus, the indictment was not constructively amended through the admission of such evidence.

Further, Mr. Sheneman has procedurally defaulted on this claim because he could have raised it on direct appeal, but did not. *Dowell v. United States*, 124 F.3d 203 (table), 1997 WL 471331, at *1 (7th Cir. Aug. 14, 1997) (stating that a failure to raise a constructive amendment claim on direct appeal "normally bars review in a § 2255 proceeding absent a showing of cause and prejudice"). Thus, he must show cause and prejudice in order to raise the issue now on collateral review. He has not done so, so this claim fails for that reason as well.

## B.  Government Misconduct Claims

Mr. Sheneman next asserts a variety of claims based on alleged misconduct by the prosecutors. These claims include that the prosecutors conspired with the clerk of the court of appeals to prevent his appellate brief from being filed; altered exhibits presented at trial; withheld exculpatory evidence; and elicited testimony they knew to be perjured. The government responds first by arguing that Mr. Sheneman has procedurally defaulted on these claims by failing to argue them on appeal. In support of this argument, the government cites two cases in which the courts held that claims of "prosecutorial misconduct" were procedurally defaulted for not having been raised on direct appeal. However, in one of those cases, *Johnson v. United States*, No. 11-cv-288, 2013 WL 1728278, at *5–6 (S.D. Ill. Apr. 20, 2013), the prosecutorial misconduct at issue was allegedly improper statements that the prosecutor made during closing arguments. That type of claim is not at issue here, and unlike the claims Mr. Sheneman asserts, the basis for that claim would have been entirely in the appellate record such that it could have been raised on direct appeal, so *Johnson* offers no support for the government's argument.

The other case the government cites, *Chappell v. United States*, 956 F.2d 272 (table), 1992 WL 42307 (7th Cir. 1992), did not specify the type of prosecutorial misconduct at issue, and thus offers little support for the government, either. In addition, the Seventh Circuit has held that the types of prosecutorial conduct at issue here, all of which would require evidence outside

the record on direct appeal in order to succeed, are properly raised in a § 2255 motion. *E.g.*, *United States v. Rosario*, 234 F.3d 347, 352 (7th Cir. 2000) (holding that a claim that the prosecutor used perjured testimony "require[s] development of facts outside the record and thus [is] more properly presented in a § 2255 petition"); *see also Bousley v. United States*, 523 U.S. 614, 621 (1998) (noting that procedural default does not apply where the claim rests on facts that were "'dehors the record [on appeal] and their effect on the judgment was not open to consideration and review on appeal.'" (quoting *Waley v. Johnston*, 316 U.S. 101, 104 (1942)). The Court therefore rejects the government's argument that these claims are procedurally defaulted, and considers the merits of each claim in turn.

**1.     Conspiring with the Clerk of the Court of Appeals to Alter Mr. Sheneman's Appeal**

Mr. Sheneman first argues that one of the prosecuting attorneys violated his right to appeal his convictions by conspiring with the clerk of the court of appeals to prevent his appellate brief in one of the cases from being filed. By way of background, Mr. Sheneman filed notices of appeal in each of the two cases, so the court of appeals opened a separate case number for each and then consolidated the two cases. *United States v. Jeremie Sheneman*, Nos. 12-2841, 12-2842 (7th Cir. Aug. 13, 2012), DE 2. The Seventh Circuit appointed counsel for these appeals, but Mr. Sheneman subsequently sought and received permission to proceed *pro se*. Various scheduling orders directed Mr. Sheneman to file his "consolidated brief" by a certain date, but the six-page opening brief that was ultimately filed on July 8, 2013 pertained only to the -126 case. *Id.* at DE 61. Because this opening brief advanced no arguments relative to the -120 case, the Seventh Circuit affirmed Mr. Sheneman's conviction in that case without discussion. Mr. Sheneman now argues that he actually submitted separate briefs for each case, and that the government prevented the brief as to the -120 case from being filed.

Mr. Sheneman's allegations as to why his brief in the -120 case was not filed are too far-fetched to be countenanced, though. He asserts that Ms. Brook, one of the prosecutors on the -120 case, "has worked for the government for many years and knows clerks of the court at the 7th C.A. and had one of them write on the top of Jeremie's direct appeal in the 12-2841 case [relative to the -126 case] to make it appear as if that one appeal was intended for both cases when Brook knew this not to be the case."[8] [Case 120, DE 212 p. 3]. Allegations in a § 2255 motion that are "palpably incredible" or "patently frivolous or false" may be summarily dismissed. *Blackledge v. Allison*, 431 U.S. 63, 76 (1977). The idea that one of the prosecutors, after receiving Mr. Sheneman's appellate briefs, contacted the clerks at the Seventh Circuit Court of Appeals to ask that they not file one (but not both) of the briefs, and that the clerk then agreed to do so, easily meets that standard. In addition, the only support for this theory is Mr. Sheneman's own statements, but he professes no personal knowledge of these alleged conversations or the circumstances under which the alleged brief for the -120 case was not filed; he simply surmises from the fact that the brief was not filed that the prosecutor must have conspired with the court of appeals to prevent its filing. These speculative and incredible allegations justify no further factual development.

Finally, Mr. Sheneman had a remedy available to him with the appellate court, and he in fact availed himself of that remedy. Rule 40 of the Federal Rules of Appellate Procedure allows a party to petition for rehearing if "the petitioner believes the court has overlooked or misapprehended" any point of law or fact. Fed. R. App. P. 40(a). After the Seventh Circuit issued its final order on the two appeals, Mr. Sheneman submitted a petition for rehearing in which he detailed each of the issues he believed the court had overlooked, and he even attached the brief

---

[8] Mr. Sheneman is presumably referring to his appellate brief, as his notices of appeal were properly filed in both cases.

he had meant to file relative to the -120 case. The Seventh Circuit denied the petition in an order dated December 10, 2013. However, since he was able to—and did—raise this issue to the court of appeals for its consideration, Mr. Sheneman did not suffer any prejudice even if his outlandish allegations of misconduct were true. Habeas relief is thus unwarranted on this claim on that basis as well.

### 2.	Altering Trial Exhibits

Mr. Sheneman next alleges that the prosecutors altered certain of the loan applications submitted at trial. Mr. Sheneman asserts that all lenders "require fully signed and dated typed loan applications to be material to funding," but that the applications submitted at trial were not fully signed and dated, so those "invalid applications" must have been altered by the government and could not have been material to the lenders' approval of the loans. Mr. Sheneman also identifies several other purported alterations of Exhibit 10B from the -120 case, which was the loan application for a property underlying two of the three counts in that case.

The Court notes to begin with that this claim strongly resembles a challenge to the sufficiency of the evidence couched in an allegation of altering evidence, in that Mr. Sheneman argues that the "invalid applications" the government admitted at trial could not have been material to the lenders' approval of the loans, so the government failed to meet its burden of proof on the materiality element. If interpreted in that respect, this argument would be baseless for a number of reasons. First, the government did not need to submit into evidence the actual applications upon which the lenders relied in approving the loan applications or releasing the funds for closing; it did not have to prove that any lender *actually* relied on the falsehoods in the applications at all in order to prove that the falsehoods were material. *Bridge*, 553 U.S. at 648–49. The government need only have proved that Mr. Sheneman participated in or devised a scheme that was *intended* to defraud another by means of falsehoods that had the *potential* to do

so. Mr. Sheneman could have been just as guilty of these charges if the lenders had immediately detected the fraud and rejected every loan application, or even if the applications were never fully signed and dated and none of the properties closed. Thus, it is inconsequential whether the applications the government submitted at trial were the applications that any lender actually relied on to approve the loans. Moreover, Mr. Sheneman is barred at this point from arguing that the government failed to meet its burden of proof at trial, as a § 2255 motion generally cannot be used to raise arguments that could have been or that were raised on a direct appeal, such as a challenge to the sufficiency of the evidence. Mr. Sheneman has not argued any exception to that rule, so he would be barred from raising this type of argument even if it were not meritless.

Even liberally construing this claim as a due process argument, however, as is appropriate given Mr. Sheneman's *pro se* status, Mr. Sheneman is not entitled to any relief. A conviction that is obtained through the knowing use of false evidence violates a defendant's right to due process of law if there is a reasonable likelihood that the evidence influenced the jury. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *United States v. Curescu*, 674 F.3d 735, 739 (7th Cir. 2012) ("Prosecutors may not use evidence that they know or should know is false to obtain a conviction, and if they do so and there is a reasonable likelihood that the evidence influenced the jury, the defendant is entitled to a new trial."). To obtain collateral relief on this basis, a petitioner must establish that: (1) there was false evidence; (2) the prosecutor knew or should have known it was false; and (3) there is a reasonable likelihood that the false evidence affected the judgment of the jury. *Morales v. Johnson*, 659 F.3d 588, 606 (7th Cir. 2011); *United States v. Freeman*, 650 F.3d 673, 678 (7th Cir. 2011).

Mr. Sheneman fails to meet any of these elements. First, the facts Mr. Sheneman alleges fail to raise any suspicion that the government altered any of the loan applications. As evidence

that the exhibits were altered, Mr. Sheneman first notes the presence of lines across each page of Exhibit 10B, arguing that they are "cut and paste marks." However, the innocuous lines appear to be nothing more than defects from a copier or fax machine—they are identical on each page, and even appear on each page of Exhibits 10A, 10H, 11, and 12, which Mr. Sheneman does not suggest were altered. In fact, the "authentic" version of the application Mr. Sheneman attached to his motion has a similar line across each of its pages, so either the Court should conclude that Mr. Sheneman altered this document as well, or that such defects are commonly associated with scanning or copying documents.

     As further evidence of the supposed alterations, Mr. Sheneman submitted what he contends is the authentic version of Exhibit 10B. That document is a loan application for the same property as Exhibit 10B and has all of the same content in the application, but differs in other details, as it contains a fax line on each page, the interviewer's signature and date, a stamp indicating it was mailed, and a different version of Phyllis' signature, among other markings. However, the existence of a different version of the loan application does not suggest that the government altered it. Rather, as Mr. Sheneman himself discussed in his allocution, and as the evidence at trial showed, an applicant typically must submit a loan application prior to closing in order to be approved for a loan, and then must sign the application again at closing. The dates on Mr. Sheneman's version of the application are in August 2005, just over a month prior to closing, and the other markings indicate that it was mailed to Phyllis and then faxed from the broker, suggesting that it was the initial application. Thus, the version in Exhibit 10B, which does not contain markings indicating that it was mailed or faxed, is likely the application that Phyllis signed in person at the closing.

Mr. Sheneman further argues that because lenders require that applications be fully signed and dated before approving loans, and the applications at issue lack certain signatures or dates, they must have been altered by the government. However, as discussed above, the government did not need to introduce the applications upon which the lenders actually relied in approving the loans, so even if Mr. Sheneman is correct about what the lenders would eventually require in an application, that would not mean that the government had altered the applications it introduced at trial. Further, the government elicited testimony at trial about the difficulty the investigating agents had in securing complete loan documentation for the properties, which had closed over five years prior to the trials, so it is not surprising or indicative of misconduct for the documents to be at varying stages of completion. Accordingly, beyond Mr. Sheneman's conclusory allegations and speculation, the Court finds no indications that the government actually altered the applications such that it used false evidence at trial, so Mr. Sheneman cannot meet the first element of this claim.

Having failed to show that the government used any false evidence at trial, Mr. Sheneman necessarily fails to show that the government knowingly used any such evidence, so he cannot meet the second element of this claim, either. Finally, even assuming the exhibits were altered as Mr. Sheneman alleges, he cannot meet the third element of this claim, as there is simply no likelihood that the juries' verdicts may have been different had the government submitted the "authentic," unaltered applications at trial. Mr. Sheneman's primary argument as to this element is that the versions of the applications that were admitted at trial could not have been relied on by the lender, and thus could not have been material. But, as just discussed, that is merely a challenge to the sufficiency of the evidence the government did introduce at trial, not an argument as to whether the verdicts would have been different absent these alleged alterations.

Mr. Sheneman also asserts that removing the interviewers' signatures from the applications misled the jury as to the source of the misrepresentations in those applications. But the identity of the interviewers and the source of the misrepresentations in the applications were explored at length during both trials. In addition, Mr. Sheneman does not suggest that the government altered the printed names of the interviewers in the applications, just that it removed or altered their signatures, so any such alteration would have little effect, anyway. Mr. Sheneman identifies other minor alterations, such as a fax line indicating the application was faxed by the broker, but those details are far too insubstantial to have had any effect on the jury's judgment.

Notably, none of the alleged alterations pertain to the aspects of the applications that the government contended were fraudulent. For example, the government argued that Exhibit 10B contained misrepresentations as to the intended use of the property (primary residence versus investment property), Phyllis' income, and the other properties owned by Phyllis. Each of those details is the same in both the "authentic" and "altered" versions of Exhibit 10B. Thus, the question, if any, is only whether the alterations cast doubt on the source of those misrepresentations. Given the overwhelming evidence that Mr. Sheneman was responsible for those misrepresentations, and the insignificant and immaterial nature of these alleged alterations, it is clear that they do not. Therefore, the Court concludes that even if the government had altered the exhibits as Mr. Sheneman alleges, there is no likelihood that the altered evidence would have affected the judgment of the juries. Accordingly, the Court finds that Mr. Sheneman is not entitled to any relief based on his claim that the government altered the evidence against him.

### 3.        Withholding Exculpatory Evidence

Mr. Sheneman next asserts a *Brady* claim, arguing that the government withheld certain evidence. *Brady* requires the government "to disclose evidence that is both favorable to the

defense and material to either guilt or punishment." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). Its failure to do so can violate a defendant's right to due process. *Id.* "To establish a *Brady* violation, a defendant must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to an issue at trial." *Id.* "Evidence is material if there is a reasonable probability that its proper disclosure would have led to a different result at trial." *United States v. Wilson*, 481 F.3d 475, 480 (7th Cir. 2007). Mr. Sheneman's primary argument under this claim is the flip-side to his argument that the government altered the exhibits, in that he asserts that the government withheld the "authentic" versions of the applications that it had altered and submitted at trial. Thus, this argument fails for many of the same reasons as the previous claim, and the Court has already found that there is no likelihood that the "authentic" applications would have led to a different result at trial.

In addition, Mr. Sheneman has not actually alleged that the government withheld or suppressed those documents, as those terms are used in a *Brady* context. Mr. Sheneman alleges only that the government withheld the documents "from the trial" and "from the jury," not that the government failed to disclose those documents to him. *See also* Case 120, DE 230 p. 3 ("The prosecution admitted that the applications provided by Jeremie in the 2255 [the "authentic" version of Exhibit 10B] had been originally provided by the government . . . . However, the government did alter the applications presented at the trial and did not submit the authentic evidence that they have in their possession."). However, *Brady* does not require the government to admit into evidence all exculpatory materials, it merely requires the government to disclose those materials to the defendant so that the defendant can use them as he sees fit. *United States v. Todd*, 424 F.3d 525, 534 (7th Cir. 2005) (defining suppression as where "(1) the prosecution failed to disclose evidence in time for *the defendant to make use of it*, and (2) the evidence was

not otherwise available to the defendant through the exercise of due diligence." (emphasis added)).

In addition, the document Mr. Sheneman attached to his § 2255 motion as the "authentic" version of Exhibit 10B contains a Bates stamp showing that it was produced to Mr. Sheneman by the government, and Mr. Sheneman essentially admits that the government had previously provided him with these documents. *See* Case 120, DE 230 p. 6 ("Truitt was aware of this authentic evidence."); DE 246 p. 1 ("[T]he government already admitted that they were the ones to supply the authentic applications pertaining to the altered loan applications submitted at trial . . . ."). Therefore, Mr. Sheneman also fails to meet the first element of his *Brady* claim, as he has not actually alleged that the government failed to disclose these documents to him. *See United States v. Jumah*, 599 F.3d 799, 809 (7th Cir. 2010) (holding that "unsupported assertions that the government suppressed evidence" are insufficient to support a *Brady* claim).

Next, in a supplemental filing, Mr. Sheneman attached a handwriting analysis conducted by the government prior to the trials, analyzing whether Mr. Sheneman had prepared certain documents relative to the -120 case. Initially, Mr. Sheneman styles this filing as a Rule 33 motion based on new evidence. However, under Rule 33(b)(1), "[a]ny motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict or finding of guilty." Fed. R. Crim. P. 33(b)(1). Mr. Sheneman's guilty verdicts were returned in March and May 2011, so this motion, filed in March 2015, cannot be considered under Rule 33. Further, much of this filing simply rehashes the arguments Mr. Sheneman raised above, which the Court has rejected. To the extent Mr. Sheneman means to make a *Brady* claim based on the handwriting analysis, though, his claim still fails. First, this document again bears a Bates stamp indicating that it was provided to Mr. Sheneman during discovery. Likewise, though the

government has not responded to this specific filing, it represented relative to Michael's § 2255 motion that it had produced this document prior to trial. [Case 126, DE 294, p. 15]. Thus, Mr. Sheneman fails to show that this evidence was suppressed.

Further, there is no probability that this document, if disclosed, would have led to a different result at trial. The report analyzed four trial exhibits against a number of known exemplars of Mr. Sheneman's writing, but due to the poor quality of the exhibits, came to "No conclusion" as to whether Mr. Sheneman prepared the documents. [Case 120, DE 246; Case 126, DE 327-1]. Of those, one was a fraudulent lease that Mr. Sheneman admitted to having written (Exhibit 7I) [Case 120, DE 81 34–35, 62–63], and another was a HUD-1 that neither party disputes was signed by Phyllis at closing (Exhibit 9A). Only one—a letter falsely describing Phyllis' intentions relative to her store, which was signed in her name but she denied having signed (Exhibit 4E)—was disputed at trial as to whether it was prepared by Mr. Sheneman.[9]

However, the report has almost no probative value as to whether Mr. Sheneman actually prepared that document. First, it did not conclude that Mr. Sheneman did not prepare the document; it reached no conclusion at all. Second, the analysis also reached no conclusion about one document Mr. Sheneman admitted to preparing, and about another document that Mr. Sheneman had not actually prepared. Thus, the analysis' failure to reach a conclusion as to the disputed letter has little tendency to show whether or not Mr. Sheneman actually prepared it. Further, even if this report cast doubt on whether Mr. Sheneman actually prepared that fraudulent letter, that was only one letter as to one property, and was only one of many misrepresentations the evidence showed Mr. Sheneman was responsible for. There is no doubt that the jury would have convicted Mr. Sheneman even if it found he had not been responsible for Exhibit 4E, so Mr.

---

[9] The fourth exhibit analyzed in the report, Exhibit 13, was admitted but never discussed at trial.

Sheneman fails under the materiality element of a *Brady* claim as well. Accordingly, the Court rejects these *Brady* claims as bases for collateral relief.

### 4.      Soliciting Perjured Testimony

Mr. Sheneman's last claim based on alleged government misconduct is that the government solicited testimony at trial that it knew to be false, in violation of his due process rights. *See Napue*, 360 U.S. 264. Such a claim is analyzed under the same framework as Mr. Sheneman's claim that the government used false exhibits at trial. Thus, to prevail on this claim, Mr. Sheneman must establish that (1) there was false testimony; (2) the prosecutor knew or should have known it was false; and (3) there is a reasonable likelihood that the false testimony affected the judgment of the jury. *Freeman*, 650 F.3d at 678.

In order to find that the testimony was false, "there does not need to be conclusive proof that the testimony was false or that the witness could have been prosecuted for perjury; all that matters is that the district court finds that the government has knowingly used false testimony." *Id.* at 680. The Seventh Circuit has "repeatedly held, however, that 'mere inconsistencies in testimony by government witnesses do not establish the government's knowing use of false testimony.'" *United States v. Saadeh*, 61 F.3d 510, 523 (7th Cir. 1995) (quoting *United States v. Verser*, 916 F.2d 1268, 1271 (7th Cir. 1990)). Further, false statements cannot be looked at in isolation; rather, "when a defendant alleges that the prosecution used perjured testimony, [a court] must inquire into whether the defendant had adequate opportunity to expose the alleged perjury on cross-examination." *Saadeh*, 61 F.3d at 523. In addition, in order to obtain relief on this basis, "'the perjured testimony must be directly related to the defendant's guilt or innocence and must relate to material facts rather than collateral issues.'" *United States v. Magana*, 118 F.3d 1173, 1193 (7th Cir. 1997) (quoting *United States v. Ferguson*, 35 F.3d 327, 332 (7th Cir. 1994)).

As to the -120 case, Mr. Sheneman alleges that the government solicited false testimony from Mr. Weiske and Mr. Veksler—the mortgage brokers on the two properties underlying the three counts in the indictment—because it knew that neither of them took any applications pertaining to any of the three counts. However, Mr. Sheneman's current claim that Mr. Weiske and Mr. Veksler had nothing to do with these loan applications directly contradicts his testimony at trial, where he extensively discussed his interactions with Mr. Weiske and Mr. Veksler and their roles in preparing the applications. [*E.g.*, Case 120, DE 81 p. 30 ("Andrew Weiske and Alex Veksler took that [income] information partly from me, partly from [Phyllis]. I sent over her financials and they, in fact, over-nighted the applications to her."); p. 33 ("I sent [Mr. Weiske] the financials, the bank statements. That's pretty much all that I sent to him. From there on he contacted my grandmother. He went over the application with her; over-nighted it to her and she sent it all back and that was -- that was it."); p. 79 ("Q. And Mr. Veksler arranged that loan? A. Yes.")]; p. 83 ("[Mr. Weiske] took the loan with my grandmother over the phone.")]. Mr. Sheneman points out that the loan applications identify other individuals as the interviewers, but both of those individuals are other people within Mr. Weiske's and Mr. Veksler's brokerages, so that does not show that Mr. Weiske and Mr. Veksler were not involved in preparing these applications.

To the extent Mr. Sheneman only means to argue that these witnesses were lying about him being the source of certain of the information in the applications, he offered that same testimony at trial and it was thoroughly incredible, so there is no reason to credit the same claims now. Finally, since Mr. Weiske and Mr. Veksler, who worked on opposite sides of the country and had no connection to each other, offered substantially the same testimony about Mr. Sheneman's dealings with them, the government would have had no reason to believe they had

both happened to concoct the same lies about Mr. Sheneman's involvement. Accordingly, Mr. Sheneman offers no basis on which to conclude that the testimony of these witnesses was false or that the government knew or should have known that it was false, so his claim fails as to these witnesses.

Mr. Sheneman next argues as to the -126 case that Ms. Zoleko and Mr. Davies lied in testifying that they had signed only a single sheet of paper prior to the closings. Mr. Sheneman offers no argument in support of his claim that the government knowingly solicited false testimony from Mr. Davies, so the Court addresses that testimony no further. As to Ms. Zoleko, Mr. Sheneman fails to show that the government knew or should have known any testimony was false, or that, even if the testimony was, there is a reasonable likelihood that it affected the judgment of the jury. To begin with, Ms. Zoleko's testimony was substantially corroborated by Mr. Davies' testimony. Both testified to a similar sequence of events in dealing with the Shenemans, including that Mr. Sheneman made similar representations to interest them in purchasing properties, they signed a single blank form to initiate the process, they viewed various properties with the Shenemans and were given certain assurances about the properties, and they then attended the closings without having signed any further documents and without needing to bring any of their own money to closing. The other two buyers, Mr. Denaway and Mr. Doolittle, testified to a substantially similar course of dealing with the Shenemans as well. Given the similarities between all these accounts, the government would have had substantial reason to believe that Ms. Zoleko's testimony on this point was truthful.

Granted, the presence of Ms. Zoleko's signatures on other documents dated before the closings presented at least some reason to question the accuracy of her testimony that she only signed one document before closing. However, multiple witnesses also testified that Mr.

Sheneman would photocopy or cut and paste signatures, and that he would forge signatures. Thus, these documents need not have led the government to believe Ms. Zoleko's testimony was false. Accordingly, the Court finds that Mr. Sheneman has not presented sufficient reasons to conclude that the government knew or should have known that any of Ms. Zoleko's testimony was false.[10]

Furthermore, for several reasons, even if this testimony was false, it would not have had any effect on the jury's verdict. First, in considering whether there is a reasonable likelihood that false testimony affected the judgment of the jury, the Court must consider "whether the defendant had adequate opportunity to expose the alleged perjury on cross-examination." *Saadeh*, 61 F.3d at 523. Ms. Zoleko's testimony on this point was explored at length on cross-examination by both defense counsel. Michael's attorney cross-examined Ms. Zoleko first, and proceeded methodically through five separate documents bearing Ms. Zoleko's signature and dated prior to the closings. As to each document, Ms. Zoleko conceded that the signature was actually hers, though as to some of them, she still denied having signed the particular document. [Case 126, DE 72 p. 72 (referring to Exhibit M-2), p. 101–02 (Exhibit M-4), p. 109 (Exhibit M-7), 110 (Exhibit M-8), 116 (Exhibit M-11)]. Mr. Sheneman's counsel then revisited this topic on his cross-examination, and Ms. Zoleko again admitted that her signature appeared on a purchase agreement. [Case 126, DE 72 p. 137–39]. Thus, these contradictions were squarely before the

---

[10] Mr. Sheneman also attaches a report from a handwriting expert that was completed in 2014 at Michael's request, which concludes that Ms. Zoleko's signature appeared on a number of documents dated prior to the closings. However, since that report was not completed until several years after trial, it cannot inform the inquiry of whether the government knew or should have known at the time of trial any testimony was false.

jury, allowing the jurors to decide for themselves whether this testimony was false, and minimizing any likelihood that false testimony would have affected the jury's judgment.[11]

Second, the number of documents Ms. Zoleko signed prior to closing was not directly related to Mr. Sheneman's guilt or innocence. The pertinent question was not how many documents Ms. Zoleko signed, but whether it was Mr. Sheneman or Ms. Zoleko who was responsible for the falsehoods in certain of the documents and whether, regardless of what Ms. Zoleko had signed, the Shenemans had nonetheless misled her or her lenders about the purchases. Even if Ms. Zoleko had testified that she had signed each of the documents in question prior to closing, that would not establish the content of those documents when she signed them—for example, the handwritten loan applications are each photocopies of each other save for the addition of the property addresses (Exhibits 23, 24, 25, 27, 28), and the notices of Ms. Zoleko's right to receive the appraisals contain photocopied signatures and dates but have other details added to each (Exhibits M-2, M-8). Nor would that testimony speak to whether she understood the documents when she signed them—for example, Ms. Zoleko freely admitted to signing the loan applications at closing, but testified that she did not realize that they misstated her citizenship and other details, and there was evidence that the Shenemans dealt with unsophisticated buyers so as to exploit their limited understanding of the process.

Furthermore, these documents related to only a portion of the greater scheme to defraud. Testimony by Ms. Zoleko that she had signed multiple documents prior to closing would have no effect on the evidence of the Shenemans' misrepresentations about the quality or rental status of the properties, the Shenemans' concealment of their conflict of interest from the lenders, or

---

[11] The Court notes that the subsequent handwriting analysis adds nothing to what was already before the jury—since Ms. Zoleko admitted that certain documents bore her signature, no expert analysis was needed to establish that point.

Michael's providing every dollar of the buyers' down payments at closing, to name a few. Therefore, given the limited importance of this particular testimony, the extent to which it was subject to cross-examination by both defendants, and the overall weight of the evidence against Mr. Sheneman, the Court concludes that there is no reasonable likelihood that this testimony, even if offered with knowledge of its falsity, would have affected the judgment of the jury. Thus, Mr. Sheneman's claim fails as to this testimony.

Mr. Sheneman next states that he wishes to incorporate each of the arguments that Michael raised in his § 2255 motion alleging that the government used false testimony at the -126 trial. However, the Court has rejected each of those arguments as to Michael's motion, and had done so even prior to when Mr. Sheneman filed his motion. [Case 126, DE 255, pp. 44–51]. Mr. Sheneman does not respond to the Court's resolution of those issues, and does not present any additional argument or any other basis for calling it into doubt. Accordingly, the Court rejects these arguments for the same reasons it rejected them as to Michael, which it need not repeat here. [*Id.*]

Finally, Mr. Sheneman argues that the government submitted false evidence through Auditor Urbanowski, specifically, an exhibit entitled "Trial Properties for Which Michael Sheneman Provided Down Payments or Had Power of Attorney." Mr. Sheneman appears to argue that this exhibit falsely identifies Superior Mortgage as the mortgage broker instead of Apex Mortgage. Initially, for reasons the Court has discussed relative to Michael's § 2255 motion, that distinction is immaterial. [Case 126, DE 321 p. 7]. More importantly here, though, this exhibit was never offered against Mr. Sheneman, either at trial or at sentencing. Rather, it was only offered against *Michael* during his sentencing hearing. [Case 126, DE 99-2, 103]. Since this evidence was never used against Mr. Sheneman, he could not have suffered any prejudice

from its use even if it had contained false information. Accordingly, the Court finds that Mr. Sheneman is not entitled to any relief on his claims that the government solicited false testimony against him.

## C.    Ineffective Assistance of Counsel

Mr. Sheneman finally argues that his attorneys were ineffective and violated his Sixth Amendment right to counsel. Following each trial, Mr. Sheneman asserted that his trial counsel, Mr. Truitt, was ineffective, and the Court appointed substitute counsel, Mr. Holesinger, to present ineffective-assistance-of-counsel claims through Rule 33 motions. The Court held an evidentiary hearing on the motion in the -120 case, and Mr. Sheneman elected to forego a hearing in the -126 case. The Court subsequently resolved both motions against Mr. Sheneman in lengthy orders. Mr. Sheneman did not address those rulings on appeal, but he now argues in his § 2255 motion that his convictions should be vacated because he received ineffective assistance of counsel.

The government first argues in response that because Mr. Sheneman could have raised his ineffective-assistance claims on his direct appeal, but failed to, those claims are now procedurally defaulted. However, the government inexcusably fails to cite or acknowledge the Supreme Court's opinion in *Massaro v. United States*, 538 U.S. 500, 504 (2003), which unequivocally rejects the government's argument: "We hold that an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." *See also Blake v. United States*, No. 10-628, 2012 WL 1133946, at *4 (S.D. Ill. Apr. 4, 2012) (holding that an ineffective-assistance claim was not procedurally defaulted where the defendant previously asserted the claim in a Rule 33 motion but did not raise it on direct appeal); *Feliciano v. United States*, No. 01 Civ. 9398, 95 CR. 941, 2004 WL 1787005 (S.D.N.Y. Aug. 10, 2004) (same). Thus, there is no basis on which

to argue that Mr. Sheneman's ineffective-assistance claim is procedurally defaulted. *United States v. Flores*, 739 F.3d 337, 341 (7th Cir. 2014) (stating that *Massaro* "held that a defendant is never obliged to raise an ineffective-assistance argument on direct appeal—held, in other words, that it is always safe to reserve the issue for collateral review").

The cases the government cites on this issue do not address procedural default, but rather the law of the case doctrine, which only applies when a defendant has actually raised an issue on direct appeal and lost. *Flores*, 739 F.3d at 341 ("[W]hen an ineffective-assistance claim is *rejected on direct appeal*, it cannot be raised again on collateral review." (emphasis added)); *Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005) ("Since *Massaro* we have reiterated that a defendant who chooses to make an ineffective-assistance argument *on direct appeal* cannot present it again on collateral review." (emphasis added)); *United States v. Rogers*, 13 F. App'x 386, 388 (7th Cir. 2001) ("[I]f such a claim *is brought on direct appeal and rejected*, any future challenges to the effectiveness of trial counsel will be constrained by the law of the case."). Here, although Mr. Sheneman could have raised his ineffective-assistance claim on direct appeal, since he had already developed the record through his Rule 33 motions, he did not do so, so there is no law of the case on this issue. *Sheneman*, 538 F. App'x at 723 ("Although Sheneman has appealed his conviction on this second scheme [the -120 case], his opening brief advances no arguments against it, so we address it no further. Sheneman challenges only the sufficiency of the evidence for the conviction on the first scheme [the -126 case]."). Therefore, neither procedural default nor the law of the case prevent Mr. Sheneman from arguing ineffective assistance as a basis for his § 2255 motion, so the Court turns to the merits of those claims.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. To satisfy this right, an attorney must not only be present with a criminal defendant at his trial, but must assist the defendant in a way that ensures the trial is fair. *Strickland v. Washington*, 466 U.S. 668, 685 (1984). A fair trial is one in which the adversarial process functions properly to produce a just result. *Id*. at 686.

To prevail on a claim for ineffective assistance of counsel, Mr. Sheneman must first demonstrate that counsel's performance was deficient—"that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. To show deficient performance, the defendant must show "that counsel's representation fell below an objective standard of reasonableness." *Koons v. United States*, 639 F.3d 348, 351 (7th Cir. 2011) (quoting *Strickland,* 466 U.S. at 688). "This means identifying acts or omissions of counsel that could not be the result of professional judgment. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id.* (citing *Sussman v. Jenkins,* 636 F.3d 329, 349 (7th Cir. 2011)).

Further, "there is a strong presumption that [the defendant's] attorney performed effectively," *Berkey v. United States*, 318 F.3d 768, 772 (7th Cir. 2003), and that the challenged conduct "might be considered a sound trial strategy." *Strickland*, 466 U.S. at 689 (citation and quotation omitted). The reasonableness of counsel's performance must be evaluated "from counsel's perspective at the time of the alleged error and in light of all the circumstances." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). So long as an attorney articulates a strategic reason for a decision that was sound at the time it was made, the decision generally cannot

support a claim of ineffective assistance of counsel. *Yu Tian Li v. United States,* 648 F.3d 524, 528 (7th Cir. 2011) (citing *United States v. Lathrop*, 634 F.3d 931, 937–38 (7th Cir. 2011) (provided counsel's reasons for not questioning further were not "so far off the wall that we can refuse the usual deference that we give tactical decisions by counsel, his performance will not qualify as deficient")); *United States v. Cieslowski*, 410 F.3d 353, 360 (7th Cir. 2005).

Even if Mr. Sheneman establishes this first element, he must also demonstrate that counsel's deficient performance prejudiced his defense—"that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. To establish prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Eckstein v. Kingston*, 460 F.3d 844, 848 (7th Cir. 2006) (quoting *Strickland*, 466 U.S. at 694); *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005) (same). "In weighing the effect of counsel's errors, the court must consider the totality of the evidence. . . . A verdict or conclusion that is overwhelmingly supported by the record is less likely to have been affected by errors than one that is only weakly supported by the record." *Eckstein*, 460 F.3d at 848 (quoting *Hough v. Anderson*, 272 F.3d 878, 891 (7th Cir. 2001)). Failure to satisfy either the performance or the prejudice prong of the *Strickland* test is fatal to a defendant's ineffectiveness claim. *Velarde v. United States*, 972 F.2d 826, 828 (7th Cir. 1992); *see Strickland,* 466 U.S. at 687 (reasoning that "[u]nless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable").

Mindful that ineffective assistance of counsel is a single claim regardless of how many errors a defendant alleges, the Court addresses each of Mr. Sheneman's arguments individually,

and then considers them collectively as to each case. To begin with, Mr. Sheneman offers some generalized complaints as to both cases about Mr. Holesinger, who represented him for the purposes of the Rule 33 motions and for sentencing. However, the only specific ground for ineffective assistance Mr. Sheneman raises as to Mr. Holesinger is his failure to object to a lack of subject matter jurisdiction. As discussed above, such an objection would have been frivolous, so Mr. Holesinger was not ineffective for not having raised such an objection. Mr. Sheneman also notes in passing that he had a right to represent himself at trial. That may be, but he never sought to invoke that right. While he voiced concerns about the performance of his appointed counsel at various points, he never sought to proceed *pro se* until his appeal. Having requested appointed counsel and lost at trial, Mr. Sheneman cannot now receive a do-over by asking to proceed *pro se*. Thus, Mr. Sheneman is entitled to no relief on that basis, either.

1.    **Case 3:10-CR-120**

Turning to the -120 case, Mr. Sheneman argues that Mr. Truitt's representation was inadequate in that he: (1) was unaware of and failed to call Phil Bornstein as a witness; (2) failed to clarify that the lenders calculated Phyllis' income based off of her bank statements and that Mr. Sheneman never submitted any fraudulent tax returns or false income statements; (3) stated in closing argument that "you cannot defraud someone or an institution or a bank if they don't care if they are defrauded"; (4) coerced Mr. Weiske to falsely testify that Mr. Sheneman told him Phyllis was planning to move into a property; (5) failed to object to testimony that Mr. Sheneman had bad credit and could not have purchased the properties in his own name; and (6) never objected that the invalid loan applications could not have been material to the lenders' decisions to approve the loans.

Mr. Sheneman's first argument is that Mr. Truitt did not know who Phil Bornstein was and failed to call him to testify. But the post-trial hearing on Mr. Sheneman's ineffective-

assistance claim established that Mr. Truitt did know who Mr. Bornstein was, and had even spoken with him prior to trial. Mr. Truitt had also reviewed a report of an interview that investigators conducted with Mr. Bornstein. Based on that investigation, Mr. Truitt decided not to call Mr. Bornstein as a witness since he had no information that could support the defense's theory. As more fully explained in the previous order, Mr. Truitt's investigation as to this witness was reasonable, and his decision not to call Mr. Bornstein as a witness was a sound trial strategy. [Case 120, DE 125 pp. 18–20]. Such strategic decisions cannot support a claim of ineffective assistance of counsel. *Strickland*, 466 U.S. at 687; *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005) ("[A] lawyer's decision to call or not to call a witness is a strategic decision generally not subject to review. The Constitution does not oblige counsel to present each and every witness that is suggested to him. If counsel has investigated witnesses and consciously decided not to call them, the decision is probably strategic."). Likewise, given that Mr. Bornstein had no favorable testimony to offer, Mr. Truitt's failure to call him could not have had any prejudicial effect on Mr. Sheneman's defense. [Case 120, DE 125 pp. 18–20].

Second, Mr. Sheneman argues that Mr. Truitt failed to clarify that the lenders calculated Phyllis' income based on her bank statements and that Mr. Sheneman never submitted any fraudulent tax returns or false income statements. As to the tax returns and income statements, there was never any evidence that Mr. Sheneman provided any tax returns or income statements—only bank statements— so there was nothing for Mr. Truitt to clarify. Mr. Truitt also elicited testimony from Mr. Sheneman that he had only sent the brokers Phyllis' bank statements, and Mr. Sheneman does not identify what else Mr. Truitt should have done in this regard.

As to the lenders calculating Phyllis' income based on her bank statements, Mr. Sheneman again does not identify what Mr. Truitt should have clarified, and he does not identify any other evidence Mr. Truitt should have offered on this topic.[12] Mr. Truitt did address this topic at trial by eliciting testimony that Mr. Sheneman had sent the brokers Phyllis' bank statements, and eliciting testimony from Mr. Sheneman that the lenders would have calculated Phyllis' income based on those statements. He also elicited testimony from Mr. Weiske that Mr. Weiske had reviewed the bank statements and believed that they showed that Phyllis was qualified for the loan. As the Court found in its previous order, Mr. Truitt's investigation into this issue was adequate and he addressed this issue in a reasonable manner, so his performance was not deficient. [Case 120, DE 125 pp. 11–18]. Further, since Mr. Sheneman has not identified what else Mr. Truitt should have clarified about this issue or what other evidence he should have offered, the Court cannot find that any prejudice could have occurred even if Mr. Truitt's performance was deficient.[13]

Third, Mr. Sheneman argues that Mr. Truitt essentially admitted that Mr. Sheneman obtained property or money at someone's expense, by stating during closing arguments that "you cannot defraud someone or an institution or a bank if they don't care if they are defrauded". [Case 120, DE 81 p. 132]. However, as the Court discussed in its previous order, Mr.

---

[12] In his Rule 33 motion, Mr. Sheneman argued that Mr. Truitt should have called an expert on subprime lending, but the Court rejected that argument, and Mr. Sheneman has not renewed it in his § 2255 motion. [DE 125 pp. 11–18].

[13] Further, the evidence at trial squarely rebutted Mr. Sheneman's argument that the lenders calculated Phyllis' income based solely on her bank statements. Mr. Weiske and Mr. Veksler both testified that Mr. Sheneman had provided the income information contained in the application. [DE 80 p. 75–76, 96–97, 104–05]. Mr. Oswald, the government's lending expert, also testified that he was unaware of any program by which lenders would calculate a borrower's income based only on their bank statements. [DE 80 p. 57]. Finally, Mr. Sheneman also testified that he had provided the same bank statements to each lender, yet the loan applications contain a wide range of income figures, and Mr. Sheneman offered no explanation that could account for the disparity in those figures. [DE 81 pp. 60–62].

Sheneman's argument misconstrues this statement and takes it out of context. Mr. Sheneman's perfunctory argument on this issue adds nothing to what was before the Court in its previous order, so for the same reasons as before, the Court finds that making this statement was neither ineffective nor prejudicial. [Case 120, DE 125 pp. 26–29].

Fourth, Mr. Sheneman argues that Mr. Truitt was ineffective because he coerced Mr. Weiske to falsely testify that Mr. Sheneman told him Phyllis was planning to move into a property. The exchange Mr. Sheneman appears to be referring to is as follows, which occurred during Mr. Truitt's cross-examination of Mr. Weiske:

> Q.    Now, as part of the background, Mrs. [Phyllis] Sheneman indicated in a signed document that she was going to live in one of the dwellings; it was going to be her primary residence?
>
> A.    That is correct.
>
> Q.    And you got that information from her?
>
> A.    That would have come from Jeremie.

[Case 120, DE 80 p. 121]. Initially, it is not apparent what Mr. Sheneman means by saying that Mr. Truitt coerced Mr. Weiske's testimony. Mr. Truitt's line of questioning was not coercive, and he was actually leading Mr. Weiske towards an answer other than what Mr. Weiske gave. Mr. Sheneman apparently believes Mr. Weiske should have answered otherwise—that the information had come from Phyllis or someone else—and may prefer that Mr. Truitt not have asked the question. However, Mr. Weiske had already testified at length on direct examination about having received all of the substantive information in the applications from Mr. Sheneman, not from Phyllis, so this single question could not have resulted in any appreciable harm. Further, this line of questioning was a legitimate, though unsuccessful, means of attempting to deflect responsibility from Mr. Sheneman by showing that Phyllis had attested to the same statements that the government asserted were false. Therefore, the Court does not believe that this represents

ineffectiveness by Mr. Truitt or that it could have caused any prejudice to Mr. Sheneman's defense.

Fifth, Mr. Sheneman argues that Mr. Truitt failed to object to testimony that Mr. Sheneman had bad credit and could not have purchased the properties in his own name. However, he does not identify any meritorious objection that could have been raised to this evidence. Perhaps Mr. Truitt could have argued that it was irrelevant, but this evidence addressed the question of why Mr. Sheneman would use Phyllis' name and credit as part of a scheme to defraud into which he invested hundreds of thousands of dollars of his own money—the answer suggested by this evidence is that he could not have done so in his own name with his own credit. Mr. Sheneman argues to the contrary that he was merely assisting Phyllis with the investment with which she had asked him for help, but the existence of that competing inference does not render this evidence irrelevant—just the opposite. In addition, having bad credit is not prejudicial in itself, so the prejudicial value of this evidence did not substantially outweigh its probative value, as would be required to sustain an objection under Rule 403. Further, even if Mr. Truitt could have raised a successful objection to this evidence, Mr. Sheneman was not prejudiced by its admission since, as noted, this evidence had minimal prejudicial value.

Last, Mr. Sheneman argues that Mr. Truitt was ineffective because he never objected that the invalid loan applications could not have been material to the lenders' decisions to approve the loans. But as discussed at length above, the applications the government submitted into evidence need not have been the actual applications that the lenders relied on in approving any of the loans; the government did not even need to establish that the lenders approved them at all. Thus, Mr. Truitt had no basis to object to the admission of these documents, nor would it have been particularly helpful to argue to the jury about whether the lenders actually relied on the

versions of the applications that the government submitted into evidence. Accordingly, Mr. Truitt was not ineffective for failing to object to these exhibits, nor was Mr. Sheneman's defense prejudiced.

Having considered and rejected each of Mr. Sheneman's ineffective-assistance arguments in isolation, the Court considers them as a whole, but the result is the same, as the sum of many nothings is nothing. In its previous order, the Court discussed at length the totality of Mr. Truitt's performance, concluding that "Mr. Truitt's performance in presenting [the] defense theory fell well within the range of competence demanded of criminal attorneys, and did not constitute deficient performance or result in prejudice." [Case 120, DE 125 p. 30; *see also* p. 31 (stating that "[f]rom the Court's perspective, defense counsel did an admirable job especially in a case where there was substantial evidence of Mr. Sheneman's guilt")]. Mr. Sheneman's present arguments do not affect that determination, so for all of the reasons stated in that order, the Court finds that Mr. Sheneman has failed to establish either prong of an ineffective-assistance-of-counsel claim. [Case 120, DE 125 pp. 29–33]. Therefore, the Court rejects Mr. Sheneman's ineffective-assistance claim as a basis for collateral relief in the -120 case.

### 2. Case 3:10-CR-126

As to the -126 case, Mr. Sheneman argues that Mr. Truitt was ineffective because he: (1) never objected to evidence of forgery on the basis that it was not alleged in the indictment; (2) never objected that the invalid loan applications could not have been material to the lenders' decisions to approve the loans; and (3) had a conflict of interest due to Michael's counsel's prior representation of a potential witness. As to the first issue, the government did not constructively amend the indictment by introducing evidence of forgery, as the Court discussed extensively above and also relative to Michael's § 2255 motion. Had Mr. Truitt objected to that evidence, his objection would have been overruled, so he was not ineffective for failing to make such an

objection, nor could Mr. Sheneman have suffered any prejudice. On the second issue, as also discussed above, the applications the government submitted into evidence need not have been the actual applications that the lenders relied on in approving any of the loans, so an objection to the admission of those exhibits would have been denied. Likewise, because the government only needed to prove that any misrepresentations had the potential to influence the lenders, arguing to the jury about whether the lenders actually relied on the versions of the applications that were submitted into evidence would have had no effect on the outcome of the case.

Last, Mr. Sheneman argues that his counsel was ineffective because Michael's attorney had a conflict of interest with a potential witness, Mr. Beam, having previously represented him in another matter. Even assuming for the sake of argument that Michael's attorney had a conflict of interest, though, Mr. Sheneman has identified no way in which that conflict could have affected the performance of *his* attorney, Mr. Truitt. Any conflict of interest Michael's attorney may have had would not have constrained Mr. Truitt or his presentation of Mr. Sheneman's defense in any manner, and cannot form the basis of an ineffective-assistance claim by Mr. Sheneman. *See Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980) ("In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected *his lawyer's* performance." (emphasis added)).

Considering Mr. Truitt's performance as to this trial as a whole, the Court again finds, as it did in its previous order, that Mr. Sheneman has failed to show that Mr. Truitt's performance fell below the requisite standard or that he was prejudiced in any manner by Mr. Truitt's performance. Mr. Truitt pursued reasonable strategies at trial, and Mr. Sheneman has wholly failed to meet his burden of showing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466

U.S. at 687. Nor has Mr. Sheneman shown any probability that, but for any errors by his counsel, the result of trial may have been different, particularly given the substantial weight of evidence against him. Therefore, and for the reasons explained at considerable length in the Court's order on Mr. Sheneman's Rule 33 motion in the -126 case [Case 126, DE 150], the Court finds that Mr. Sheneman is entitled to no relief on his ineffective-assistance-of-counsel claim in the -126 case.

**D.       Procedural Requests**

Mr. Sheneman makes various other procedural requests relative to his § 2255 motion. First, several of his filings request that this Court transfer this § 2255 motion to another district. Under 28 U.S.C. § 2255(a), motions to vacate, set aside, or correct a sentence must be directed to "the court which imposed the sentenced." *See also* Rules Governing Section 2255 Proceedings for the United States District Courts R. 4(a) (stating that motions under § 2255 must be forwarded "to the judge who conducted the trial and imposed sentence"). Mr. Sheneman presents no authority or argument that would authorize transferring this matter to a different court, so these requests are denied.

Mr. Sheneman also makes a number of discovery requests. Under Rule 6(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts, "A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." This rule codifies the Supreme Court's holding in *Harris v. Nelson*, 394 U.S. 286, 300 (1969) that "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Bracy v. Gramley*, 520 U.S. 899, 909 (1997). "Good cause, however,

cannot exist where the facts alleged do not provide a basis for relief." *Hubanks v. Frank*, 392 F.3d 926, 933 (7th Cir. 2004).

First, Mr. Sheneman asks the Court to direct the government to produce each of the "authentic" loan applications that it had altered for use at trial. As discussed at length above, though, Mr. Sheneman's arguments relative to the authentic applications are baseless for multiple reasons, and the submission of those documents would add no support to Mr. Sheneman's § 2255 motion, so discovery as to these documents is unwarranted. Mr. Sheneman also requests the 302 reports of investigators' interviews with a number of witnesses. However, he does not indicate for what purpose he seeks those reports or how they would support his claim, so the Court denies this request. Finally, Mr. Sheneman seeks the production of an analysis the government conducted prior to trial to determine whether he had forged certain documents. The Court ordered the government to produce that document to Michael relative to his § 2255 motion, and Mr. Sheneman subsequently filed that document on his own behalf as well. Since he has received this document already, this request is moot.

Mr. Sheneman also requests that the Court hold a hearing in this matter. Generally, "a district court must grant an evidentiary hearing if the movant 'alleges facts that, if proven would entitle him to relief.'" *Sanders v. United States*, 288 F. App'x 283, 288 (7th Cir. 2008) (quoting *Stoia v. United States*, 22 F.3d 766, 768 (7th Cir. 1994)). However, "[m]ere unsupported allegations cannot support a petitioner's request for a hearing," and "[i]t is well-established in this circuit that the district court need not hold a hearing on § 2255 petitions in every case where the petitioner makes factual allegations." *Aleman v. United States*, 878 F.2d 1009, 1012 (7th Cir. 1989); *see also Gallo-Vasquez v. United States*, 402 F.3d 793, 797 (7th Cir. 2005) ("A hearing is not necessary if the petitioner makes conclusory or speculative allegations rather than specific

factual allegations."). "[W]hen considering § 2255 petitions, if a court determines that the record standing alone conclusively demonstrates that a petitioner is entitled to no relief, then no hearing is required." *Humphrey*, 896 F.2d at 1070.

Here, Mr. Sheneman has not properly alleged sufficient facts that, if proven, would entitle him to relief, and the record conclusively shows that he is entitled to no relief. Mr. Sheneman's substantive claims are frivolous and do not depend on any factual determinations. His claims of government misconduct are speculative, conclusory and, in some cases, squarely contradicted by his testimony at trial, and, for the most part, would not entitle him to relief even if the alleged misconduct had occurred. As to Mr. Sheneman's ineffective-assistance claims, he has wholly failed to identify acts or omissions by his counsel that could not be the result of professional judgment, or to establish that his defense could have been harmed by any such acts or omissions. In addition, the Court already held an evidentiary hearing on Mr. Sheneman's ineffective-assistance claim in the -120 case. Accordingly, the Court finds that Mr. Sheneman is not entitled to a hearing on his motion, and denies that request.

Last, Mr. Sheneman requests appointment of counsel. "[A] petitioner under § 2255 does not have a constitutional right to counsel," *Rauter v. United States*, 871 F.2d 693, 695 (7th Cir. 1989), but a court may appoint counsel for a § 2255 motion under 18 U.S.C. § 3006A(a)(2)(B) "if the interests of justice so require." In addition, under the Rules Governing Section 2255 Proceedings for the United States District Courts, a court must appoint counsel if a hearing is warranted or if necessary for effective discovery. Rules 6(a), 8(c). The Court has denied Mr. Sheneman's discovery requests and found that he is not entitled to a hearing, so he is not entitled to counsel for those reasons. Further, the Court finds that the interests of justice do not require appointment of counsel. Mr. Sheneman has demonstrated that he is capable of representing

himself in pursuing this motion, as he is intelligent and articulate enough to express his positions to the Court. Moreover, Mr. Sheneman has not identified any colorable argument that, if developed with the assistance of counsel, could entitle him to relief. Accordingly, the Court finds that Mr. Sheneman is not entitled to appointed counsel, and denies this request as well.

## IV.  CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11 of the Rules Governing Section 2255 Proceedings for the United States District Courts, the Court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and the Rule permits the Court to hear further argument on whether a certificate of appealability should issue.  A certificate of appealability may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c); Rule 11, Rules Governing Section 2255 Proceedings for the United States District Courts.  The substantial showing standard is met when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (quotation marks omitted) (quoting *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)); *see Young v. United States*, 523 F.3d 717 (7th Cir. 2008).  A defendant is not required to show that he will ultimately succeed on appeal. *Miller-El v. Cockrell,* 537 U.S. 322, 342 (2003) (stating that the question is the "debatability of the underlying constitutional claim, not the resolution of that debate").

Here, none of Mr. Sheneman's claims present a substantial showing that any of his constitutional rights were violated. His substantive claims are wholly frivolous; his assertions of government misconduct are speculative and conclusory and do not suggest any entitlement to relief; and he has not come close to establishing either prong of the ineffective-assistance-of-counsel claims. The Court does not believe that the resolution of any of Mr. Sheneman's claims

is subject to debate, and therefore it declines to issue a certificate of appealability as to any issue in this motion.

The Court advises Mr. Sheneman that pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, when the district judge denies a certificate of appealability, the applicant may request a circuit judge to issue the certificate. The Court further advises Mr. Sheneman that Rule 4(a) of the Federal Rules of Appellate Procedure governs the time to appeal an order entered under the rules governing § 2255 proceedings. *See* Rule 11(b), Rules Governing Section 2255 Proceedings for the United States District Courts. Under Rule 4(a), when the United States is a party in a civil case, any notice of appeal may be filed by any party within 60 days after the judgment or order appealed from is entered. Fed. R. App. P. 4(a); *Guyton v. United States*, 453 F.3d 425, 427 (7th Cir. 2006) (stating that "the time to contest the erroneous denial of [the defendant's] first § 2255 motion was within 60 days of the decision").

## V. CONCLUSION

Mr. Sheneman received fair trials consistent with the law, and there is no doubt that he is in fact guilty of every one of the charges for which he has been convicted. The Court therefore DENIES Mr. Sheneman's motion under § 2255 and DECLINES to issue a certificate of appealability. The Court further DENIES each of Mr. Sheneman's ancillary requests relative to his § 2255 motion. The Clerk is DIRECTED to enter judgment as to Mr. Sheneman's § 2255 motion, and to terminate each of the pending motions as to Jeremie Sheneman in these two cases.

SO ORDERED.

ENTERED: May 12, 2015

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court